*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  October 16, 2014                    517092
_____

TERRENCE GIBBS,
                    Respondent,

          v                                    MEMORANDUM AND ORDER

RALPH PORATH et al.,
                    Appellants.
_____

Calendar Date:   September 8, 2014

Before:   McCarthy, J.P., Rose, Egan Jr., Devine and Clark, JJ.

_____

          Thomas H. McCann, Malone, for appellants.

          John A. Piasecki, Malone, for respondent.

_____

Egan Jr., J.

          Appeal from a judgment of the Supreme Court (Demarest, J.),
entered April 25, 2013 in Franklin County, upon a decision of the
court in favor of plaintiff.

          In 1975, plaintiff, Howard Gibbs (plaintiff's brother) and
Robert Laight (plaintiff's brother-in-law) acquired title to
approximately 20 acres of land located in the Town of Chateaugay,
Franklin County.  The parcel in question was bounded on the north
by the Chateaugay River and bounded on the south by Healey Road.
Shortly after acquiring the parcel, plaintiff and Laight
constructed residences thereon, with Laight's home lying
generally east of plaintiff's residence.[1]  Thereafter, in or

_____

          [1]  Although Gibbs spent time on the parcel over the years,
installing a driveway and building a shed thereon, he did not

about 1981 or 1982, plaintiff and Laight constructed a shared pond near the Healy Road border of their respective parcels (hereinafter the upper pond). A few years later, plaintiff constructed another pond on his property near his border with the Chateaugay River (hereinafter the lower pond).

In 1997, the brothers and Laight decided to formally subdivide the parcel. To that end, they retained a Canadian firm to prepare a general map of the property, which, in turn, was used to draft the respective deeds. The map, which was not a formal survey, resulted in plaintiff obtaining what was depicted as a generally rectangular parcel of land measuring roughly 5.1 acres; Gibbs's parcel, lying to the west of plaintiff's land, measured approximately 5.94 acres, and Laight's parcel, lying to the east of plaintiff's land, measured approximately 8.6 acres. Laight's parcel subsequently changed hands twice before being conveyed to defendants in April 2009. According to plaintiff, he and defendants' predecessors in title all understood the location of the boundary line between the two relevant parcels – an understanding that resulted in plaintiff's residence, fire pit, bird houses, a portion of the upper pond and all of the lower pond lying within plaintiff's parcel.

After defendants acquired the former Laight parcel, they retained Kip Cassavaw, a licensed land surveyor, to prepare a formal survey of their property. According to the Cassavaw survey, the boundary line between plaintiff's and defendants' respective parcels extended farther west than previously believed, resulting in both ponds, plaintiff's garage and residence and just shy of one acre of plaintiff's land being depicted as lying entirely within the border of defendants' property. Prior to and following the receipt of this survey, defendants began making various changes to the upper and lower ponds, which included installing certain four-inch pipes and clearing a number of trees. Plaintiff then hired Timothy Langdon, also a licensed land surveyor, who ultimately prepared a survey map that essentially was consistent with plaintiff's

construct his residence upon the property until approximately 2000.

understanding as to the location of his common boundary line with defendants.  The Langdon survey was recorded in the office of the Franklin County Clerk in August 2010.

Plaintiff thereafter commenced this action against defendants seeking, among other things, a declaration attesting to the validity of the boundary line asserted by him and money damages for wrongful trespass and the resulting loss of trees and vegetation.  Defendants answered and counterclaimed seeking, among other things, a declaration that they are the rightful owners of the disputed acreage.  Following a nonjury trial, Supreme Court — employing the doctrine of practical location — determined the shared boundary line between plaintiff and defendants to be as depicted on the Langdon survey and, further, awarded plaintiff damages in excess of $40,000.  This appeal by defendants ensued.

As a general proposition, "[d]eeds and surveys indicate boundary lines by various descriptive elements or 'calls' which consist mainly of monuments, courses and distances, adjacent lands and area or quantity" (Thomas v Brown, 145 AD2d 849, 850 [1998]).  Here, however, Langdon testified — and our review confirms — that the subject deeds contain no specific bearings or directional calls and set forth only the vaguest description of the intended boundary line between the land originally conveyed to plaintiff and Laight.  Indeed, Langdon opined that the deeds in question were "so bad" that a boundary line could not be established absent either a boundary line agreement, which the parties apparently were unable to forge, or judicial intervention.[2]  To that end, where a dispute exists as to the location of a boundary line, "the intent of the parties existing at the time of the original conveyance of the disputed property controls" (Markowski v Ferrari, 174 AD2d 793, 794 [1991], appeal dismissed 78 NY2d 1061 [1991]; see Thomas v Brown, 145 AD2d at 850).  Pursuant to the doctrine of practical location, "the practical location of a boundary line and an acquiescence of the

_____

[2]  At some point following the completion of Langdon's survey, plaintiff and Gibbs apparently entered into a boundary line agreement as to their common border.

parties therein for a period of more than [the statutory period governing adverse possession] is conclusive of the location of the boundary line" (Kaneb v Lamay, 58 AD3d 1097, 1098 [2009], lv denied 12 NY3d 709 [2009] [internal quotation marks and citation omitted]; accord Robert v Shaul, 62 AD3d 1127, 1128 [2009]; see McMahon v Thornton, 69 AD3d 1157, 1160 [2010]). "[A]pplication of the doctrine requires a clear demarcation of a boundary line and proof that there is mutual acquiescence to the boundary by the parties such that it is definitely and equally known, understood and settled" (Jakubowicz v Solomon, 107 AD3d 852, 853 [2013] [internal quotation marks and citations omitted]).

Here, plaintiff testified that he built his residence on the now disputed portion of his property in the late 1970s, with both the assistance and acquiescence of Gibbs and Laight, and has occupied the home on a weekend basis ever since that time. Additionally, plaintiff testified that he dug the shared upper pond with Laight in the early 1980s and thereafter constructed the lower pond on what he understood to be his property.[3] Plaintiff further testified that, when the original parcel was formally subdivided in 1997, "[e]verybody knew where their property boundaries were. . . . [A]nd even after the Laights sold their property, it was the same deal with the new people that moved in."[4] As a result of this mutual understanding, plaintiff testified, his residence, bird houses, fire pit, lower pond and one half of the upper pond all were located upon his property.

Although the Cassavaw survey relied upon by defendants purports to locate both ponds and plaintiff's residence within the western border of defendants' property, defendant Ralph Porath testified that his immediate predecessor in title, Elwood Hodge, advised him — prior to purchasing the former Laight parcel — that the common boundary line with plaintiff ran "somewhere through the [upper] pond." Additionally, shortly after

---

[3] Notably, Gibbs confirmed that the upper pond divided the parcels occupied by plaintiff and Laight.

[4] The term "new people" is an apparent reference to defendants' predecessors in title.

purchasing the parcel, Porath had two conversations with plaintiff, wherein either their common boundary line or the ownership of the respective ponds was discussed. Porath first testified that approximately two weeks after he purchased his property, he and plaintiff were standing near the upper pond — facing toward the river — when he asked plaintiff where the property line was located. As described by Porath, plaintiff "stretched [out] his arm" and said, "Right down the middle . . . [a]ll the way down the middle to the river." After moving in, Porath again approached plaintiff, this time inquiring as to plaintiff's willingness to share the cost of reviving the upper pond (arguably a tacit admission of the shared ownership), which had fallen into disrepair. According to Porath, plaintiff was not interested in expending funds to fix the upper pond, but he did offer to repair the lower pond, which plaintiff indicated belonged to him, if Porath wanted to repair the upper pond. In response, Porath hired a contractor and rebuilt the upper pond. At some point thereafter, Porath obtained the Cassavaw survey and began clearing the area around the lower pond.

The foregoing testimony, in our view, is more than sufficient to demonstrate a mutual understanding and acquiescence as to the practical location of the boundary line existing between plaintiff's and defendants' respective parcels. Accordingly, we have no quarrel with Supreme Court's decision to fix the location of such boundary as set forth on the Langdon survey map. Although the practical location of that boundary line indeed results in defendants obtaining less — and plaintiff obtaining more — land than described in their respective deeds (approximately .87 acres), "quantity is [t]he least reliable of all descriptive particulars" (Lougaris v Spilio, 204 AD2d 775, 776 [1994] [internal quotation marks and citation omitted]) and, in this particular case, this discrepancy is insufficient to overcome the uncontroverted evidence in the record relative to the intent of the parties at the time of the original conveyance. In light of this conclusion, we need not address plaintiff's alternative claim sounding in adverse possession.

Of the remaining arguments raised by defendants, only Supreme Court's award of damages merits discussion. Plaintiff offered the testimony of Aaron Stark, an excavation contractor,

and Herbert Boyce, a consulting forester, to establish the damage done or remediation required with respect to the subject ponds and surrounding property. Stark testified that, upon his inspection, both ponds were essentially stagnant and that approximately 175 feet of the roadway connecting the upper and lower ponds was eroded and in need of repair. Specifically, with respect to the ponds, Stark testified that the four-inch pipes previously installed would need to be plugged or removed, that a spillway would need to installed for each pond and that a certain amount of backfill would be required. When combined with the estimated repairs to the roadway, the total cost of the required remediation would be $8,621.16. Stark's trial testimony, however, fails to allocate or break down the cost of the repairs, and the Langdon survey — as adopted by Supreme Court in fixing the practical location of the parties' common boundary — depicts a large portion of the upper pond and the roadway in question as belonging to defendants. As defendants surely cannot be held accountable for damaging property that they actually own, awarding the entire cost of the foregoing repairs to plaintiff as damages is inappropriate.

As for the tree removal performed by defendants' contractor in the vicinity of the lower pond, Boyce calculated the "acreage of rehabilitation" to be approximately .13 acres and estimated the cost of reforesting that area to be $31,680.40. However, it appears from both Boyce's trial testimony and his written report that the acreage of rehabilitation includes the pond itself. Indeed, Boyce's report sets forth the estimated cost "[t]o reforest the area that was harvested and turned into a cleared area and pond" (emphasis added), and he acknowledged at trial that, if there was a preexisting pond at that location, he would have to reduce the overall acreage calculation by the area of the pond itself, the latter of which he did not measure. As there is no question that the lower pond — although subsequently overgrown — indeed previously existed, Boyce's reforestation estimate appears to be inaccurate — particularly in light of plaintiff's acknowledgment that, when defendants' contractor cleared trees and vegetation from that area, he cleared to roughly the same point that plaintiff had cleared when the lower pond was first constructed in the late 1970s.

Beyond the apparent inaccuracies and/or lack of specificity in the estimates provided by Stark and Boyce, it strikes us that plaintiff, who testified that he did not use the lower pond after it "blew out" in the late 1980s or early 1990s, is entitled to either the cost of restoring that pond to a sustainable body of water or the cost of having the area surrounding the lower pond, which was cleared by defendants' contractor, reforested. Defendants should not, however, have to bear the cost of rebuilding the pond and reforesting the very area that plaintiff himself cleared when constructing the lower pond in the first instance. Accordingly, Supreme Court's judgment is modified, and this matter is remitted for a redetermination as to damages. Defendants' remaining contentions, to the extent not specifically addressed, have been examined and found to be lacking in merit.

McCarthy, J.P., Rose, Devine and Clark, JJ., concur.

ORDERED that the judgment is modified, on the law, without costs, by reversing so much thereof as awarded plaintiff damages in the amount of $40,301.56; matter remitted to the Supreme Court for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court